**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CHARLES M. BRADLEY, | :: | CIVIL ACTION NO. |
| Inmate # GDC 128857, EF 468920, | :: | 1:05-CV-0775-RWS |
|     Plaintiff, | :: | |
| | :: | |
|     v. | :: | |
| | :: | |
| DR. JOSEPH PARIS, | :: | PRISONER CIVIL RIGHTS |
| DR. SHARON LEWIS, | :: | 42 U.S.C. § 1983 |
|     Defendants. | :: | |

## <u>ORDER AND OPINION</u>

Now before the Court are Defendants' Motion for Summary Judgment [Doc. 21] and Plaintiff's Response [Doc. 23].

## I.  BACKGROUND

Plaintiff, a Georgia prisoner, sues herein Dr. Joseph Paris, M.D., who served as Statewide Medical Director for the Georgia Department of Corrections (GDOC) from 1996 through December 31, 2005; and Dr. Sharon Lewis, M.D., who succeeded Dr. Paris as the Statewide Medical Director on January 17, 2006, after serving as Director of Utilization Management (UM) for the GDOC during the time period relevant to Plaintiff's complaint.  [See Docs. 1, 4, 10, 12; Doc. 21-4 (Ex. 1), Aff. of Dr. Joseph Paris (hereinafter Paris Aff.) ¶ 4; Doc. 21-5 (Ex. 2), Aff. of Dr. Sharon Lewis (hereinafter Lewis Aff.) ¶¶ 4-6.]  Plaintiff executed the instant complaint on

March 8, 2005, alleging that he has chronic Hepatitis C and that the GDOC Medical Director cancelled the liver biopsy that the gastrointestinal specialist at Macon State Prison had scheduled for him in February 2004.  Plaintiff seeks "punitive and monetary damages" and an order requiring the GDOC to re-schedule his liver biopsy and "furnish [him] with all necessary treatment" for his disease.  [Doc. 1.]

## II.  SUMMARY JUDGMENT STANDARD AND PROCEDURES

Summary judgment is proper if the pleadings and other documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002)

2

(internal quotations omitted).  Morever, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

The movant bears the initial burden of demonstrating that summary judgment is warranted.  Apcoa, Inc. v. Fidelity Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990). The movant may do so by showing "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  Once the movant has properly supported the summary judgment motion, the non-movant then must "come forward with specific facts showing that there is a *genuine issue for trial*," i.e., that the evidence is sufficient to support a jury verdict in the non-movant's favor.  Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (internal quotations omitted).  See also Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that "non-moving party must come forward with *significant, probative evidence*") (emphasis added).  "[C]onclusory assertions . . . [without] supporting

3

evidence are insufficient to withstand summary judgment." Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

Nevertheless, "courts have been reluctant to apply" to *pro se* prisoners the Rule 56(e) requirement that a non-movant "cannot rely on his pleadings, but must file a response that includes other evidence." Lawrence v. Wiley, Civil Action No. 1:03-CV-2970-RWS, 2006 U.S. Dist. LEXIS 4917, at *15-16 (N.D. Ga. Jan. 24, 2006). See also Gonzalez v. Long, 889 F. Supp. 639, 642 (E.D.N.Y. 1995) (allowing *pro se* prisoner additional time to respond to summary judgment motion, "mindful that *pro se* litigants should be given special latitude" in doing so, but noting that "abject failure to comply with the requirements of Rule 56(e) and [the court's local rule] would normally require the Court to grant" summary judgment motion).

A motion for summary judgment may be supported or opposed with "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed. R. Civ. P. 56(c).[1] "As a general rule, the court may

---

[1] This Court's Local Rules provide additional requirements. "A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. The court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated

consider on a Rule 56 summary judgment motion any material that would be admissible or usable at trial." Property Mgmt. & Inv., Inc. v. Lewis, 752 F.2d 599, 604 n.4 (11th Cir. 1985) (assuming without deciding "that authenticity and completeness are among the evidentiary requirements of Rule 56"). See also Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) (stating that court "may consider only . . . evidence [that] can be reduced to an admissible form," and noting that "evidence that is otherwise admissible may be accepted in an inadmissible form at summary judgment stage," and that, although hearsay generally cannot "be reduced to admissible form," statement of party's agent or servant may be admissible under Fed. R. Evid. 801(d)(2)(D) as admission of party-opponent); Woods v. City of Chicago, 234 F.3d 979, 987-88 (7th Cir. 2000) (stating that Rule 56(e) "does not *require* that all

---

as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts." N.D. Ga., LR 56.1.B.(1). The response to the motion for summary judgment "shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts." N.D. Ga., LR 56.1.B.(2)a.(1). "This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1)." N.D. Ga., LR 56.1.B.(2)a.(2).

5

supporting material be submitted in affidavit form,"[2] and stating further that "court may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits") (citation and internal quotations omitted).

## III.  CONTENTIONS OF THE PARTIES

A.    **Defendants' Motion for Summary Judgment**

     1.    **Defendants' Statement of Undisputed Material Facts**

Defendants set forth the following allegedly undisputed material facts. Defendants state that Plaintiff, who has been incarcerated since 2001, "received a liver biopsy on May 25, 2005"; was thereafter "treated with Pegylated Interferon and Ribavirin"; and is being "monitored by trained infectious diseases and liver specialists."   [Doc. 21-2, Defendants' Statement of Undisputed Material Facts (hereinafter Defs.' Facts) ¶ 2.]  The actual treatment of HCV patients in Georgia prisons "is managed at the State Prison Chronic Illness Clinic . . . for HCV, which is

---

     [2] An affidavit "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence," and may be supported by "[s]worn or certified copies" of documents referred to in the affidavit. Fed. R. Civ. P. 56(e). An "unsworn declaration, certificate, verification, or statement" may be used in the place of a sworn affidavit to support or oppose a motion for summary judgment if the declaration "is subscribed by [the declarant], as true under penalty of perjury, and dated."  See 28 U.S.C. § 1746.

an integral part of the regular prison medical unit." [Id. ¶ 10.] Dr. Paris, an expert in the treatment of prisoners infected with the Hepatitis C virus (HCV), "collaborated with other qualified physicians in writing three published versions of the [GDOC's] Clinical Update on HCV, which are used as reference materials" by the GDOC's UM staff. [Id. ¶¶ 4-6, 9.] "Prison primary care physicians request services, consults, and tests from the UM system which is run in accordance with standard UM techniques and other recognized methodologies." [Id. ¶ 11.] Defendants assert that they had no direct personal involvement in the medical decisions affecting Plaintiff. [Id. ¶¶ 7-11.]

The standard GDOC approaches to treatment of HCV patients are constantly evolving based on new information and treatment options. The GDOC consults with, *inter alia,* "specialists in HCV capable of rendering diagnostic and therapeutic recommendations." [Id. ¶ 12.] Until 2004-05, unless a patient's blood screenings reflected an abnormal liver function, "the medical community assumed that a biopsy would not be helpful because treatment was not recommended at the early stages of the disease." [Id. ¶ 14.] HCV is a disease that progresses slowly, especially when a patient, like Plaintiff, has no access to alcohol. [Id. ¶¶ 14-15.] "The degree of liver damage or the stage of the disease centers on the extent of the fibrosis, or scarring, suffered by the patient's liver." [Id. ¶ 15.] Progression from one stage of the disease

7

to the next usually requires eight to twelve years.  [Id.]  It has often been advisable to delay treatment during the early stages of HCV because re-treatment following an unsuccessful treatment is seldom successful, disease progression is slow, and treatment efficacy has increased dramatically in recent years.  [Id. ¶¶ 17-18.]  In balancing the benefits of immediate treatment against the possible harm of premature treatment, "it is medically unwise and unsound to start a patient's treatment before it reaches a stage of fibrosis of the liver."[3]  [Id. ¶ 19.]

Plaintiff's HCV treatment has been managed pursuant to the latest available GDOC Clinical Updates, dated, respectively, August 1999, June 2003, and November 2004.  [Id. ¶ 20.]  Plaintiff has been monitored at least every three months, and, prior to his biopsy, "his liver was not palpable or enlarged," nor was he "documented as jaundiced" or observed with "liver pain."  [Id. ¶ 21.]  The 1999 Clinical Update recommended that an HCV patient with an Alanine Leucine Transferase (ALT) blood

---

[3]  Dr. Paris's affidavit, upon which Defendants' statement of facts is largely based, elaborates on this point: "Fibrosis occurs prior to cirrhosis.  Cirrhosis does not occur until stages four to six of the disease, depending on the staging method selected. . . . [Plaintiff] is at present 57-years old.  His liver biopsy, performed on May 25, 2005, showed only zero portal fibrosis and was termed Stage Zero Fibrosis by the pathologist.  In the absence of alcohol, . . . progression to Stage Four (cirrhosis) would take approximately 48 years.  At that time, [Plaintiff] would be 105-years old."  [Paris Aff. ¶ 15.]

level five times the normal range be considered for a liver biopsy and possible treatment; the 2003 Clinical Update recommended such consideration for a patient with twice the normal ALT blood level; and the 2004 Clinical Update recommended consideration for a biopsy and therapy for any HCV patient with an elevated ALT blood level.  Under current practice, it is not recommended that an HCV patient with a normal ALT blood level receive a liver biopsy and therapy.  "As long as a patient's ALTs and liver enzymes are within normal range, the HCV does not pose a serious threat of injury to the patient."  [Id. ¶¶ 22-23.]

The results of Plaintiff's eleven liver function screenings between June 29, 2001, and October 7, 2004, revealed that he "consistently maintained normal ALT values[.] [H]e nevertheless received a liver biopsy" on May 25, 2005.  [Id. ¶ 24.]

> On January 27, 2004, and May 10, 2004, respectively, [Plaintiff's] primary care physicians requested liver biopsies from the [UM] staff. Pursuant to the effective Clinical Update's recognized standard of care and because of [Plaintiff's] persistently normal ALT values in numerous readings, both requests were appropriately denied.  [Plaintiff's] primary care physicians did not appeal the UM decisions.

[Id. ¶ 25.]  "Progression of HCV disease in [Plaintiff's] case is measured in many decades, not months."  [Id. ¶ 26.]  "Thus far, [Plaintiff] has responded to the HCV therapies and his viral loads are undetectable following treatment."  [Id. ¶ 27.]

9

In accordance with the current standard of care, [Plaintiff] finished his recommended treatment in June 2006 and a final HCV viral load should be checked every six months. This was done and the HCV viral load was undetectable. [Plaintiff] achieved a sustained viral remission which is the goal of Pegylated Interferon-Ribavirin therapy.

[Id. ¶ 28.]   [See generally Doc. 21-3, Brief in Support of Defendants' Motion for Summary Judgment (hereinafter Defs.' Supp. Br.) at 1-8.]

## 2.   **Defendants' arguments**

Defendants argue that they are entitled to summary judgment for several reasons. First, Plaintiff's "condition did not amount to a serious medical need." [Defs.' Supp. Br. at 9.] Plaintiff "was treated for hepatitis in accordance with the standard medical procedure and received the necessary treatment," and "there is no evidence . . . that [he] was harmed by the established treatment schedule." [Id. at 9-10.] In fact, although Plaintiff disagrees with the timing of his treatment, he may have been harmed by earlier treatment because "[t]here is medical evidence to suggest that the longer [he] was able to wait for the treatment he requested the more likely it [was] that he [would] be successfully treated." [Id. at 10.] Next, Defendants argue that they were not deliberately indifferent to Plaintiff's medical needs. "A review of the record reveals that [Plaintiff] was seen repeatedly for his disease and that his condition was closely monitored over time, including visits to the chronic care clinic, blood test[s,]

10

and referrals to specialists, as well as various other treatments." [Id. at 11.] Defendant Paris argues that, as a supervisor, he cannot be held liable on a theory of vicarious liability. [Id. at 12-13.] Finally, Defendants argue that they are entitled to qualified immunity from Plaintiff's claims. [Id. at 12-17.]

**B.    Plaintiff's Response**

In response, Plaintiff states that the GDOC's HCV treatment guidelines, which deny treatment until the "liver is under pressure," constitute cruel and unusual punishment because, in many cases, a patient's ALT or liver enzyme levels "do not give a comprehensive picture of liver damage," and, instead, a biopsy is the best diagnostic tool for assessing the progress of the disease. [Doc. 23 (Pl.'s Resp.) at 1-2.] Plaintiff notes that HCV patients who are more than forty years of age have an increased risk of developing Type 2 diabetes, but does not allege that he has developed that condition. [Id. at 2.]

Plaintiff next details the history of his treatment since being diagnosed with HCV in 2001. Plaintiff states that he requested HCV treatment in October 2001 because he was experiencing symptoms "that may be indicative of significant liver disease progression, such as: joint pain, flu-like-illness, itching of skin, indigestion and sudden exhaustion." [Id.] In August 2003, Plaintiff requested a liver biopsy. In

11

February 2004, a prison doctor scheduled a biopsy for him, which was cancelled. Plaintiff finally received a biopsy in May 2005, after filing numerous prison grievances and the instant civil action. [Id. at 2-4.] Plaintiff's drug treatment began on July 28, 2005, and ended in January 2006. His "final viral load test was undetectable, indicating [he] has achieved a su[]stained viral remission." [Id. at 4.]

Plaintiff argues that his claims satisfy all the requirements for a successful Eighth Amendment cause of action – he had a serious medical need, as diagnosed by prison doctors; Defendants displayed deliberate indifference to that serious medical need by delaying his biopsy and treatment; and Defendants are not entitled to qualified immunity because a prisoner's right to essential medical care, without delay, is clearly established under federal law. [Id. at 4-6.]

## IV.  DISCUSSION

**A.** **42 U.S.C. § 1983 cause of action and immunity of state officials**

To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that an act or omission committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. See Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995). A § 1983 plaintiff may sue state officials in either their individual or official capacities.

12

See Stevens v. Gay, 864 F.2d 113, 115 (11th Cir. 1989) (stating that, "[i]n cases where a complaint does not specify clearly whether officials were sued in their official capacity, the course of proceedings will indicate the nature of the liability sought to be imposed") (internal quotations omitted). There are, however, significant limitations on potential § 1983 liability for state officials and the agencies that employ them. "A state, a state agency, and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable; but a state official sued in his official capacity is a person for purposes of § 1983 when prospective relief, including injunctive relief, is sought." Edwards v. Wallace Community College, 49 F.3d 1517, 1524 (11th Cir. 1995).

A § 1983 plaintiff may also sue a state official in his or her individual capacity for retrospective relief, including monetary damages. See Hafer v. Melo, 502 U.S. 21, 30-31(1991) (holding that "the Eleventh Amendment does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983") (internal quotations omitted). However, a § 1983 plaintiff may not sue a supervisory official simply on the basis of that official's supervisory status. See Marsh v. Butler County, 268 F.3d 1014, 1035 (11th Cir. 2001) (en banc) (noting that "[s]upervisory officials cannot be held liable [under § 1983] for the acts of employees solely on the

13

basis of respondeat superior").  To state a claim for relief based on supervisory liability, a plaintiff must allege either that "the supervisor personally participate[d] in the alleged unconstitutional conduct or [that] there is a causal connection between the actions of [the] supervising official and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).  A causal connection may be shown if (1) the supervisor is on notice of a history of widespread abuse and has failed to take corrective action; (2) the supervisor has a custom or policy that resulted in the alleged violation; or (3) the facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id.

**B.**     **Deliberate indifference to a serious medical need**

The Eighth Amendment prohibits indifference to a serious medical need so deliberate that it "constitutes the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal quotations omitted).  To demonstrate deliberate indifference, a plaintiff must show both "an objectively serious medical need" and the defendant's subjective knowledge of, and more than negligent disregard of, that need. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003). See also Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (noting that "a

14

'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730 (2002).

"A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) (noting that "prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain"). See Hill, 40 F.3d at 1187, 1188 (stating that "[d]elay in access to medical attention can violate the Eighth Amendment when it is tantamount to unnecessary and wanton infliction of pain," but "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed") (citation and internal quotations omitted); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (stating that "deliberate delay on the order of hours in providing care for a serious and painful broken foot is sufficient to state a constitutional claim").

15

Negligence, however, even rising to the level of medical malpractice, does not constitute deliberate indifference.  McElligott, 182 F.3d at 1254.  See also Hinson v. Edmond, 192 F.3d 1342, 1345 (11th Cir. 1999) (noting that it is well-settled that "medical malpractice–negligence by a physician–is insufficient to form the basis of a claim for deliberate indifference"), amended by 205 F.3d 1264 (11th Cir. 2000); Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (noting that "[m]ere negligence in diagnosing or treating a medical condition is an insufficient basis" for deliberate indifference claim).  Nor does a simple disagreement over a diagnosis or course of treatment constitute deliberate indifference.  As long as the medical treatment provided is "minimally adequate," a prisoner's preference for a different treatment does not give rise to a constitutional claim.  See Harris v. Thigpen, 941 F.2d 1495, 1504-05 (11th Cir. 1991); see also Adams, 61 F.3d at 1547 (concluding that medical provider's "failure to administer stronger medication" to prisoner who subsequently died was "a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983").

16

**B.**   **Analysis**

The parties agree on, or at least Plaintiff does not dispute, the following facts: Plaintiff was diagnosed with HCV in 2001; he had a series of liver function screenings from June 2001 through August 2005; all but one of those screenings indicated that his ALT levels were normal;[4] in January and May 2004, Plaintiff's treating physicians requested that he be scheduled for a liver biopsy, but those requests were denied pursuant to GDOC policy because Plaintiff's ALT levels had been consistently normal; Plaintiff received a liver biopsy in May 2005, which revealed that his liver was in Stage Zero Fibrosis; he received treatment with Pegylated Interferon and Ribavirin between July 2005 and January 2006; followup testing in June 2006 revealed that his HCV was in sustained remission; and GDOC medical personnel continue to monitor Plaintiff's liver function.  [See Defs.' Facts; Pl.'s Resp.]

A prisoner infected with hepatitis has a serious medical need.  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (noting that defendants "wisely" did not argue otherwise, and further noting that defendants' alleged "complete withdrawal

---

[4] The liver function screening on January 7, 2004, "revealed a minor elevation so it was repeated in twenty days," and, apparently, revealed a normal ALT level at that time.  [Paris Aff. ¶ 18; see Doc. 5 (Pl.'s Initial Disclosures) attach. (Plaintiff's blood test results for January 7, 2004, indicating that his ALT level was 61, just above the reference range of 2-60).]

17

of treatment" for plaintiff's HIV and hepatitis, if true, "constitutes deliberate indifference"). See also Allen v. Burnside, No. 5:06-cv-151, 2007 U.S. Dist. LEXIS 72689, at *3, *7, *10-13 (M.D. Ga. Sept. 28, 2007) (denying summary judgment to Medical Administrator at Georgia prison on HCV prisoner's deliberate indifference claim, based on eleven-month delay between specialist's recommendation for liver biopsy and prisoner's receipt of same, followed by nine-month delay between prison doctor's order to begin drug treatment and start of same).  Plaintiff, however, has received treatment for his serious medical condition, HCV, which is currently in remission and is being monitored by GDOC medical personnel.  Accordingly, the only issue before the Court with respect to Plaintiff's constitutional claim is whether the delay in Plaintiff's liver biopsy and subsequent drug treatment constituted deliberate indifference to his serious medical need.  For the reasons set forth below, the Court concludes that it did not.

"More than half of people with hepatitis C will never have any health problems from it.  The disease generally progresses slowly, over the course of 10 to 40 years." www.hepatitis.va.gov at "National Hepatitis C Program – Basics – Hepatitis C – What are the long-term effects of hepatitis C?"

> Most patients are discovered to have hepatitis C because they try to donate blood or elevated liver enzymes (ALT and AST) are found on routine blood tests. Patients with persistently abnormal ALT (liver enzyme) should be screened for hepatitis C. Jaundice (yellow color of the skin from liver malfunction) is unusual. Some patients have fatigue as a result of hepatitis C but most patients have no symptoms at all from the virus until they develop advanced cirrhosis. The virus is found primarily in the blood and in the liver where is causes inflammation. Over a period of ten to forty years the liver becomes progressively damaged and 20-50% of patients eventually develop cirrhosis.

www.hepatitisdoctor.com/hcv_handout.htm (website of Dr. Bennet Cecil, upon whose medical opinion Plaintiff relies for proposition that liver biopsy is best diagnostic tool for assessing HCV [see Pl.'s Resp. at 1-2], but which also notes that use of liver biopsy "in routine practice may be reduced by blood tests" and that "[m]ost patients can be properly managed without a liver biopsy").

In 2002, the National Institutes of Health (NIH) published their most recent consensus statement on Hepatitis C – "NIH Consensus Statement on Management of Hepatitis C: 2002" (hereinafter 2002 Consensus Statement). http://consensus.nih.gov at "Previous Conference Statements" – 2002. In discussing approaches to diagnosing and monitoring patients, the statement notes the following distinctions between monitoring ALT blood levels and performing a liver biopsy:

> Testing for serum ALT levels is the most inexpensive and noninvasive, but relatively insensitive, means of assessing disease activity. A single

determination of ALT level gives limited information about the severity of the underlying liver disease. In most studies, a weak association exists between the degree of ALT elevation and severity of the histopathological findings on liver biopsy. Serial determinations of ALT levels over time may provide a better means of assessing liver injury, but the accuracy of this approach has not been well documented. Patients who initially have a normal ALT level should undergo serial measurements over several months to confirm the persistence of normal ALT levels. Although loss or reduction in HCV RNA is the primary indicator of response to antiviral therapy, the resolution of elevated ALT levels with antiviral therapy appears to be an important indicator of disease response. Nevertheless, pegylated interferon can cause mild elevations of ALT during therapy, and ALT levels are insensitive in detecting disease progression to cirrhosis.

. . . .

Liver biopsy provides a unique source of information on fibrosis and assessment of histology. Liver enzymes have shown little value in predicting fibrosis. Extracellular matrix tests can predict severe stages of fibrosis but cannot consistently classify intermediate stages of fibrosis. . . . Although *unexpected etiologies of liver disease are rarely discovered on liver biopsies from patients undergoing evaluation of chronic hepatitis C*, the information obtained on liver biopsy allows affected individuals to make more informed choices about the initiation or postponement of antiviral treatment.

. . . .

Approximately 30 percent of patients with chronic HCV infection have normal ALT levels, and another 40 percent have ALT levels less than two times the upper limit of normal. Although most of these patients have mild disease, histologically, some may progress to advanced fibrosis and cirrhosis. *Experts differ on whether to biopsy and treat these patients.*

20

2002 Consensus Statement at 14-15, 22 (emphasis added).  The statement also notes, as areas for future research, "a need to more clearly establish the role of liver biopsy in the therapeutic management of patients with chronic hepatitis C," and the "*value of liver biopsy in patients with normal liver enzymes*."  Id. at 33 (emphasis added).  The 1997 NIH Consensus Statement for Management of Hepatitis C, which is now used as an historical document only, notes that "serial determinations of ALT levels can be recommended as the general means of monitoring patients with this disease," but that "[l]iver biopsy is considered the gold standard for assessment of patients with chronic hepatitis."  http://consensus.nih.gov at "Previous Conference Statements" – "Link to Archive of Older Statements" – 1997.

The gist of the foregoing commentary is that monitoring ALT blood levels is a useful, although incomplete, tool for assessing the severity of the HCV disease.  Although a more complete assessment may require a liver biopsy, even for patients with normal ALT levels, *experts differ* on whether biopsy and treatment for such patients is necessary.  Therefore, delaying biopsy and treatment for a patient such as Plaintiff, who consistently had normal ALT levels, is much different from delaying treatment for a painful broken foot, which constitutes deliberate indifference.  See Hughes, 894 F.2d at 1538.  The delay at issue here, by contrast, involved a medical

practitioner's choice between two acceptable monitoring and treatment regimens. On the one hand, given the drawbacks inherent in relying solely on ALT levels, a more aggressive use of biopsy and treatment for Plaintiff might have been indicated. On the other hand, however, because experts acknowledge the uncertainties involved in the treatment of HCV, and premature treatment of Plaintiff's HCV might have been detrimental to his long-term prognosis, the approach that Defendants adopted for treating Plaintiff did not constitute even medical malpractice, much less deliberate indifference to a serious medical need. In short, the correct approach to Plaintiff's treatment was "a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983." See Adams, 61 F.3d at 1547. Accordingly, Plaintiff's Eighth Amendment claim fails.[5]

---

[5] The Court notes that Plaintiff already has received all of the prospective relief that he seeks herein, namely, a liver biopsy and state-of-the-art treatment for his disease, so that his requests for prospective relief are now moot. See 2002 Consensus Statement at 17 (noting that combination therapy with ribavirin and pegylated interferons represents an important therapeutic advance in the treatment of HCV). Therefore, because Plaintiff can obtain only prospective relief from state officials (such as Defendants) who are sued in their official capacity, see Edwards, 49 F.3d at 1524, he can no longer pursue his claims against them in that capacity, regardless of the merits of those claims. However, Plaintiff disputes Defendants' assertions that they played no personal role in the decision to delay his biopsy and treatment. Therefore, if Plaintiff's constitutional claims had sufficient merit, there would still be a genuine issue of material fact as to whether Defendants could be held liable in their individual capacities. [See Doc. 10 attach. (UM Decision to deny prison doctor's

## V.  CONCLUSION

For the foregoing reasons,  Defendant's Motion for Summary Judgment [Doc. 21] is **GRANTED**, and the instant action is **DISMISSED**.

**IT IS SO ORDERED**, this  24th  day of October, 2007.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

---

request for Plaintiff's liver biopsy, listing Dr. Lewis as UM Authority).]  See also Cottone, 326 F.3d at 1360 (noting that supervisor (such as Dr. Paris) may be held liable in his individual capacity if he establishes policy (such as GDOC's Clinical Updates) pursuant to which constitutional violation occurs).  Finally, the issue of Defendants' qualified immunity is moot.  See Crosby v. Paulk, 187 F.3d 1339, 1345 (11th Cir. 1999) (noting that "the failure to state a violation of federal law resolves or moots the issue of qualified immunity").